IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARBOUR ANTIBODIES BV, HARBOUR ANTIBODIES HCAB BV, ERASMUS UNIVERSITY MEDICAL CENTER ROTTERDAM and DR. ROGER KINGDON CRAIG, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 21-1807 (MN) |
| v. | ) ) | |
| TENEOBIO, INC., | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Brian A. Biggs, Stephanie O'Byrne, DLA PIPER LLP (US), Wilmington, DE; Michael Sitzman, DLA PIPER LLP (US), San Francisco, CA; Susan Krumplitsch, DLA PIPER LLP (US), East Palo Alto, CA – Attorneys for Plaintiffs

Luke W. Mette, ARMSTRONG TEASDALE LLP, Wilmington, DE; John K. Villa, Matthew B. Nicholson, Peter S. Jorgensen, WILLIAMS & CONNOLLY LLP, Washington, DC – Attorneys for DLA Piper LLP (US)

Jack B. Blumenfeld, Jeremy A. Tigan, Megan E. Dellinger, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Nicholas Groombridge, Eric Alan Stone, GROOMBRIDGE, WU, BAUGHMAN & STONE LLP, Cold Springs, NY; Jennifer Gordon, Peter Sandel, Tanya S. Manno, Chih-wei Wu, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, NY; Wendy A. Whiteford, J. Drew Diamond, AMGEN INC., Thousand Oaks, CA – Attorneys for Defendant

October 23, 2024
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE

Presently before the Court are the objections (D.I. 71) of Defendant Teneobio, Inc. ("Defendant" or "Teneobio") to Special Master Sue L. Robinson's October 3, 2022 Report and Recommendation (D.I. 70) ("the Report"), which recommended denying Defendant's motion to disqualify DLA Piper LLP (US) ("DLA") as Plaintiffs' counsel (D.I. 40).[1]  The Court has reviewed the Report, Defendant's objections and DLA and Plaintiffs Harbour Antibodies BV, Harbour Antibodies HCAB BV, Erasmus University Medical Center Rotterdam and Dr. Roger Kingdon Craig's (collectively, "Plaintiffs" or "Harbour") response thereto (D.I. 76), and the Court has considered *de novo* the objected-to portions of the Report, the relevant portions of the motion and the supporting documentation (D.I. 40-44, 50-56, 64-66), as well as the transcript of the September 16, 2022 hearing before the Special Master (D.I. 72, Ex. 1).  For the reasons set forth below, Defendant's objection to the Report's conclusion is OVERRULED, the Report's conclusion is ADOPTED, and Defendant's motion to disqualify is DENIED.

## I.    **BACKGROUND**

The Report sets forth a detailed description of the parties, their relationship with each other and the procedural history.  (*See* D.I. 70 at 1-5).  The parties have not objected to any of those sections of the Report and the Court finds no error in those sections.  The Court therefore adopts those sections and incorporates them here:

**THE PARTIES**

DLA is a global law firm that operates through separate and distinct legal entities, including DLA Piper LLP (US), DLA Piper UK LLP, DLA Piper France LLP, DLA Piper Australia, and DLA Piper Dinu SCA (in Romania). (D.I. 52, ¶ 3) Prior to October 19, 2021,

---

[1]    On October 16, 2024, the parties filed a stipulation stating that Plaintiffs "are in the process of changing counsel, and would appreciate a brief period of time for their new counsel to appear and get up to speed." (D.I. 160 at 1).  The stipulation, however, did not address the pending objections to the Report or suggest that the objections are now moot.

Teneobio was a "privately held, clinical stage biotechnology company developing a new class of biologics called Human Heavy-Chain Antibodies." (D.I. 42, ex. A) On July 27, 2021, Amgen Inc. ("Amgen") announced its intentions to acquire Teneobio, a transaction that was completed on October 19, 2021 (D.I. 42, exs. A, B), making Teneobio a wholly owned subsidiary of Amgen.

**DLA'S RELATIONSHIP WITH AMGEN**

DLA has performed legal work for Amgen over the course of years, as reflected in the multiple engagement letters made part of this record. For instance, in September 2008, a master engagement letter was executed between DLA Piper (US) and "Amgen Inc., including its subsidiaries and affiliates (hereinafter collectively, 'Amgen')," that would apply if DLA were to perform certain intellectual property work. (D.I. 42, ex. C) That engagement terminated no later than April 2020. (D.I. 52, ¶¶ 5-7) In February 2014, Amgen Romania and DLA Piper Dinu executed an engagement letter regarding advice on corporate and regulatory matters, which engagement is still ongoing on an amended basis. (D.I. 52, ¶¶ 14-15, exs. 1, 2) In December 2017, DLA agreed to represent the interests of "Amgen" in a review of its "Worldwide Compliance and Business Ethics Program." (D.I. 42, e., G) In December 2018, DLA Piper Australia and DLA Piper France executed essentially identical master engagement letters with "Amgen, Inc., including its subsidiaries and affiliates (hereinafter collectively, 'Amgen')," covering certain intellectual property work. (*Id.*, exs. D, E) These engagements terminated in February 2020 and January 2020, respectively. (D.I. 52, ¶¶ 10, 13) On December 14, 2021, "Amgen" executed an engagement letter with DLA Piper (US) regarding "Power Purchase Agreement Advice." (D,I, 42*,* ex. F)

During the same course of years, DLA has requested and received waivers and consents from "Amgen Inc." for potential conflicts of interest. (*Id.*, exs. H, I) However, "[t]o Amgen's knowledge, Amgen has never waived a conflict to allow DLA Piper to be adverse to Amgen or its affiliates in litigation. And to Amgen's knowledge, DLA Piper has never asked for such a waiver." (*Id.*, ¶ 9)

**DLA'S RELATIONSHIP WITH HARBOUR**

In November 2020, DLA Piper (US) began working on a matter through DLA Piper UK for Harbour Biomed (Shanghai) Co., Ltd. ("Harbour Biomed"). (D.I. 51, ¶ 3) In January 2021, DLA Piper UK and Harbour Biomed entered a formal engagement letter that involved assisting Harbour Biomed "in preparing a patent filing

strategy concerning an antibody discover[y] platform." (D.I. 52, ¶ 16, ex. 3) On August 6, 2021, DLA Piper (US) was asked to represent Harbour in a potential action against Teneobio, and began billing time to the matter on August 18, 2021. (D.I. 51, ¶¶ 4, 7) After completing "an extensive review and investigation of the underlying factual and legal issues presented by" Harbour's patents, DLA filed a complaint on behalf of Harbour against Teneobio on December 23, 2021. (*Id.*, ¶¶ 10, 11)

**TENEOBIO'S RELATIONSHIP WITH AMGEN**

According to the papers filed by Teneobio, it is a "wholly owned subsidiary of Amgen, which Amgen acquired on October 19, 2021." (D.I. 42, ¶ 2) In this regard, Amgen "does not operate Teneobio as an independent business; all of Teneobio's employees are Amgen employees, and the Amgen employees who run the Teneobio business report up to Amgen management." (*Id.*, ¶ 3) Amgen "makes strategic decisions for Teneobio," including "all … legal decisions for this case," as Teneobio "does not have a separate legal department." (*Id.*) The 2020 10-K filed on behalf of Amgen included its subsidiaries. (D.I. 65, ex. A at 1) The 2021 10-K filed on behalf of Amgen identified its "[a]cquisition activities [as] complex," and went on to explain that "failures or difficulties in integrating or retaining new personnel or in integrating the operations of the businesses, products or assets we acquire (including related technology, commercial operations, compliance programs, manufacturing, distribution and general business operations and procedures) may affect our ability to realize the benefits of the transaction. . . ." (*Id.* at 49) Teneobio has argued that the relief sought in this action "includes both an injunction against and damages from Amgen," thus constituting direct adversity. (Reply at 6)

**PROCEDURAL BACKGROUND**

As noted, on December 23, 2021, Harbour sued Teneobio for infringement of several patents which disclose a platform technology that utilizes transgenic rodents to generate functional heavy chain-only antibodies ("HCAbs") for therapeutic or research purposes. (D.I. 1) In the complaint, Harbour seeks both injunctive relief and damages.

Teneobio filed its answer on March 4, 2022 (D.I. 9), and a scheduling order was entered by the Court on April 29, 2022.

(D.I. 21)[2] Discovery commenced, and Harbour served its first set of interrogatories and requests for production on Teneobio, both of which define Teneobio as "including without limitation subsidiaries, divisions, affiliates . . . and all other persons acting or purporting to act[ ] on behalf of Teneobio, Inc." (D.I. 43, exs. A, B) The Parties engaged in settlement efforts in May, through which process the in-house Amgen lawyer primarily responsible for this litigation became aware of a potential conflict between DLA and Teneobio's parent, Amgen. On June 7, 2022, Amgen's General Counsel informed DLA's General Counsel that "DLA's representation of the *Harbour* plaintiffs appeared to have given rise to a conflict" due to "the potential compliance engagement" memorialized in the December 14, 2021 engagement letter regarding "Power Purchase Agreement Advice."[3] (D.I. 42, ¶ 7, exs. K, L)  During their efforts to resolve the conflicts issue, Amgen requested that Harbour "give an enforceable commitment to Amgen Inc. ('Amgen') that in this action Harbour will not seek any form of injunctive relief against Amgen Inc. and/or any of its subsidiaries/affiliates other than Teneobio, Inc. ('Teneobio'), and further will not seek recovery of damages or other form of monetary remedies from Amgen Inc. and/or any of its subsidiaries/affiliates other than Teneobio." (D.I. 66, ex. B) Harbour responded that neither it nor DLA would agree to "Amgen's extraordinary and baseless demand." (*Id.*, ex. C) The Motion was filed on July 18, 2022.

(D.I. 70 at 1-5).

Briefing on Teneobio's motion to disqualify DLA was completed on August 22, 2022. (*See* D.I. 41, 42, 43, 44, 50, 51, 52, 53, 54, 55, 64, 65, 66).[4]  The Special Master heard oral argument on September 16, 2022.  (*See* D.I. 72 Ex. 1).  After reviewing the materials submitted

---

[2]    According to the Court-ordered schedule, fact discovery is to be completed by March 15, 2023, the *Markman* hearing is to be conducted on August 16, 2023, expert discovery is to be completed by February 2, 2024, and trial is to commence on August 26, 2024. (D.I. 21).

[3]    The "Power Purchase Agreement Advice" engagement letter is characterized by Amgen counsel as DLA's advising "Amgen and its affiliates regarding multiple aspects of their Environmental, Social, and Governance initiatives at locations around the world." (D.I. 42, ¶ 7, Ex. F).

[4]    Plaintiffs joined in DLA's opposition to the motion to disqualify.  (*See* D.I. 56).

and considering each party's arguments, on October 3, 2022, the Special Master issued her Report recommending denial of Teneobio's motion. (*See* D.I. 70). First addressing whether a concurrent conflict exists, the Special Master noted that DLA's representation of Amgen in unrelated matters does not automatically mean that DLA represents Teneobio. (D.I. 70 at 9 (citing Rule 1.7(a), Comment [34])). Instead, she found it necessary to examine the "total context" of the relevant relationships, and found the record unclear as to whether DLA's representation of Amgen included representation of its affiliates (*e.g.*, whether Teneobio constituted an affiliate after it was acquired in October 2021). (D.I. 70 at 9). In the past, Amgen had at times specified that affiliates were covered by its relationship with DLA, but not always and not in the recent (and active) December 2021 DLA-Amgen engagement. (*Id.* at 9-10). The Special Master also found that the record was unclear as to whether the operations of Amgen and Teneobio were so interrelated that they should be considered one client. (*Id.* at 10). Ultimately, she was unpersuaded that Teneobio's status as an Amgen subsidiary gave rise to a conflict as of August 6, 2021 (when DLA began working on the Harbour litigation) or as of December 23, 2021 (when DLA filed the Harbour lawsuit against Teneobio). (*Id.* at 10-11).

Nevertheless, because it was essentially undisputed that Teneobio became a wholly-owned (and interrelated) subsidiary of Amgen, a current DLA client, the Special Master noted that DLA's representation of Harbour against Teneobio in this litigation now arguably represents a conflict of interest under Rule 1.71(a)(1). (D.I. 70 at 11). The Report, however, concluded that conflict was "thrust upon" DLA because it did not exist at the time DLA accepted representation of Harbour (August 2021) and only arose during the ongoing yet unrelated representation of both Harbour and Amgen. (*Id.*). Further, the Special Master found that the conflict was not "reasonably foreseeable" to DLA by the time this lawsuit was filed (December 2021) because there was no evidence that

DLA knew or should have known that Teneobio would "los[e] its corporate identity within months" of the Amgen acquisition.  (*Id.*).  And because the conflict was not reasonably foreseeable and arose through no fault of DLA, automatic disqualification was not the proper remedy.  (*Id.*).  Instead, the Special Master employed a balancing test used by a number of courts to conclude that disqualification was not the appropriate remedy to address the conflict of interest that arose after DLA began its representation of Harbour.  (*Id.* at 12-14).  As such, the Special Master recommended denying Teneobio's motion to disqualify DLA as Plaintiffs' counsel in this action.

Teneobio objected to the Report, primarily arguing that the Special Master erred in finding that a conflict of interest was "thrust upon" DLA, and, as a result, disqualification was warranted.  (D.I. 71).  DLA and Plaintiffs responded that the "thrust upon" doctrine applies to DLA's conduct, and that the Report correctly declined to recommend disqualification.  (D.I. 76).  The Court addresses the parties' arguments below.[5]

## II.  <u>LEGAL STANDARD</u>

The Court's power to disqualify an attorney stems from its inherent authority to supervise the professional conduct of attorneys appearing before it.  *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).  In the District of Delaware, attorney conduct is governed by the Model Rules of Professional Conduct of the American Bar Association ("the Rules").[6]  *See* D. Del. LR 83.6(d); *see also Intellectual Ventures I LLC v. Checkpoint Software Technologies, Inc.*, Civ. No. 10-1067-LPS, 2011 WL 2692968, at *5 (D. Del. June 22, 2011).  Disqualification is warranted if the party moving for disqualification is able to "clearly show that continued

---

[5]    The litigation was stayed at the parties' request from February 16, 2023 until October 3, 2024.  (*See* D.I. 118, 121, 158).

[6]    Motions to disqualify counsel raise issues that are not unique to patent law and, as such, Third Circuit law applies.  *See In re ATopTech, Inc.*, 565 F. App'x 912, 913 (Fed. Cir. 2014); *Apeldyn Corp. v. Samsung Elecs. Co.*, 693 F. Supp. 2d 399, 408 (D. Del. 2010).

representation by opposing counsel would be impermissible" under the Rules. *Buschmeier v. G&G Invs., Inc.*, Misc. No. 2:03mc00506, 2007 WL 4150408, at *5 (W.D. Pa. Nov. 19, 2007). "Nevertheless, motions to disqualify are generally disfavored." *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F.Supp.2d 369, 373 (D. Del. 2009). As a result, "[e]ven when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy. Relevant factors depend on the specifics of the case, but generally include the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the integrity of legal proceedings, and preventing unfair prejudice." *In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022). Ultimately, the Court retains wide discretion in determining whether disqualification is "just and fair to all parties involved." *Miller*, 624 F.2d at 1201 (internal quotation marks and citation omitted).

At issue here is Rule 1.7 of the Model Rules of Professional Conduct ("Rule 1.7") which outlines the extent of a lawyer's duty to avoid representations that conflict with the interests of current clients:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
>> (1) the representation of one client will be directly adverse to another client; or
>>
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

MODEL RULES OF PROF'L CONDUCT R. 1.7(a).

Accordingly, Rule 1.7 "provides that an attorney may not represent two clients when representation of one would be 'directly adverse' to or would 'materially limit' representation of

the other, unless the attorney 'reasonably believes' that the representation of the other would not be 'adversely affected' and both clients consent to the representation." *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F.Supp.2d 579, 582 (D. Del. 2001); *see also* MODEL RULES OF PROF'L CONDUCT R. 1.7(b). Rule 1.7 likewise applies when two attorneys *at the same firm* discover they have "ethical obligations to different clients whose interests may conflict." *United States v. Bellille*, 962 F.3d 731, 738 (3d Cir. 2020).

The Comments to Rule 1.7 explain that discerning a "client" for purposes of evaluating a conflict can be a nuanced inquiry. Illustratively, a lawyer for a corporation or organization is *not* automatically barred from accepting representation adverse to that entity's affiliate or subsidiary, "unless the circumstances are such that the affiliate should also be considered a client of the lawyer." MODEL RULES OF PROF'L CONDUCT R. 1.7, Comment [34]. "Circumstances in which an affiliate is considered a client of a lawyer can arise by express agreement or when affiliates are so interrelated that representation of one constitutes representation of all." *Dr. Falk Pharma GMBH v. Generico, LLC*, 916 F.3d 975, 982 (Fed. Cir. 2019) (citing *GSI Commerce Sols., Inc. v. BabyCenter, LLC*, 618 F.3d 204, 210-12 (2d Cir. 2010)). Moreover, even where there is a "concurrent conflict of interest" under Rule 1.7(a), a lawyer may still represent a client if they reasonably believe they can "provide competent and diligent representation to each affected client;" "the representation is not prohibited by law;" the representation does not occur in the same action; and, most importantly, "each affected client gives informed consent, confirmed in writing." MODEL RULES OF PROF'L CONDUCT R. 1.7(b)(1)-(4).

## III.    DISCUSSION

Teneobio objects to the Report on three grounds: (1) the Report improperly shifted the burden of proof to Teneobio to prove the concurrent conflict of interest was not "thrust upon"

DLA; (2) the "thrust upon" doctrine does not apply as a matter of law; and (3) the Report erred in recommending against disqualification.  (D.I. 71).

### A.    The Burden of Proving the "Thrust Upon" Doctrine's Applicability Rests with the Party Possessing the Conflict

"The 'thrust upon' exception [or doctrine] applies when unforeseeable developments cause two current clients to become directly adverse."  *Microsoft Corp. v. Commonwealth Sci. & Indus. Rsch. Org.*, Case No. 6:06 CV 549, 2007 WL 4376104, at *6 (E.D. Tex. Dec. 13, 2007).  If the "thrust upon" doctrine applies, then the Court may adopt "a more flexible approach to disqualification."  (D.I. 70 at 11).  *See Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 WL 1401030, at *7 (M.D. Tenn. Mar. 26, 2015) (Some courts have "indicated that disqualification is not required, at least where the conflict is 'unforeseeable' or 'thrust upon' the attorneys.")

Following a determination that a current conflict exists under Rule 1.7(a)(1), the Report then analyzed whether the conflict was "thrust upon" DLA.  (D.I. 70 at 11).  The Report concluded that it was Teneobio's burden to prove that the conflict was not "thrust upon" DLA.  (*Id.* at 9, 11-12).  Teneobio, however, argues that it was instead DLA's burden to prove that the "thrust upon" doctrine should apply.  (D.I. 71 at 9).[7]  On this issue, the Court agrees with Teneobio – the party seeking to benefit from the "thrust upon" doctrine has the burden of establishing its applicability.

As a preliminary note, the Court observes that there is a dearth of case law discussing the "thrust upon" doctrine or any burden shifting that may apply.  Although the Report and the parties fairly referenced a 2005 Formal Opinion from the New York City Bar Association to support their analysis, the New York City Bar Association opinion is silent regarding burden shifting.  The Court, however, finds that similar legal frameworks as well as other district courts' applications of

---

[7]    DLA Piper does not convincingly contest Teneobio's assertion.  Rather, DLA argues "[r]egardless of who bore the burden, the factual record, which the Master carefully reviewed, supported DLA and Harbour."  (D.I. 76 at 9).

the "thrust upon" doctrine support the conclusion that it was DLA's burden to prove the "thrust upon" doctrine applied.

The "thrust upon" doctrine is similar to an affirmative defense insofar as it mitigates the potential consequences of a client conflict. Therefore, requiring the movant to establish the inapplicability of the "thrust upon" doctrine would run afoul of the general rule that a plaintiff does not need to anticipate, plead, and negate the applicability of any affirmative defenses or mitigation efforts. *See, for example, VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, at 300-301 (3d Cir. 2014) ("[A] plaintiff does not need to plead mitigation efforts" because "a plaintiff cannot anticipate and answer all the possible theories of mitigation."). Indeed, the lawyer arguing for the disqualification of its adversary would be ill-equipped to argue how the conflict arose through no fault of its adversary. The non-movant lawyer, whose disqualification is sought, would be far better positioned to argue the circumstances upon which the conflict was thrust upon them and explain why it was "unforeseeable" to them. In other words, the Court cannot expect Teneobio's attorneys to know if DLA believed the conflict was "thrust upon" them and why DLA believed the conflict was unexpected.

Additionally, the Court observes that in several other district courts the lawyer whose disqualification is sought argues that the "thrust upon" exception mitigates their conduct. *See Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30 TC, 2008 WL 648545, at *4-*5 (D. Utah Mar. 10, 2008) (law firm that was sought to be removed arguing the conflict was "thrust upon" it); *Hsin-Yi Wu v. Colo. Reg.'l Ctr. Project Solaris LLLP*, Civil Action No. 19-cv-02443-RM-STV, 2020 WL 6044318, at *2 (D. Colo. Oct. 13, 2020) (same); *El Camino Res., LTD., et al., v. Huntington Nat'l Bank*, 623 F.Supp.2d 863, 884 (W.D. Mich. 2007) (same); *Bd. of Regents of the Univ. of Neb. v. BASF Corp.*, 4:04CV3356, 2006 WL 2385363, at *10-11 (D. Neb. Aug. 17, 2006)

(same).  And, further, the District of New Jersey applies a similar burden-shifting approach to disqualification motions.  There, "[i]f a motion to disqualify is based on an alleged former representation, then the party seeking disqualification bears 'the initial burden of production' to show 'that the lawyer(s) for whom disqualification is sought formerly represented their present adverse party . . .[and] [o]nce that burden is met, then the attorney whose disqualification is sought must 'demonstrate that the matter or matters in which he . . . represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought.'"  *HP Ingredients Corp. v. Sabinsa Corp.*, C.A. No. 21-cv-16800 (GC) (RLS), 2022 WL 3363231, at *8 (D.N.J. Aug. 10, 2022) (internal citations omitted).  Here too, the Court finds that it is logical and appropriate to require the movant to bear the initial burden of production to show that the lawyer whose disqualification is sought does have a client conflict under Rule 1.7; and then, once that burden is met, the burden shifts to the nonmovant, whose disqualification is sought, to demonstrate that the  conflict was merely "thrust upon" them.

Therefore, the Court agrees with Teneobio insofar as it was DLA's, and not its, burden to prove the conflict was "thrust upon" it.

### B.    The "Thrust Upon" Doctrine does not Apply to DLA's Conduct

Second, regardless of burden shifting, Teneobio argues the "thrust upon" doctrine does not apply as a matter of law to Teneobio's conduct.  (D.I. 71 at 10-13).  The Court agrees.

For a lawyer to benefit from the "thrust upon" doctrine, the New York City Bar Association has stated that four elements must exist:

> (1) [the conflict] did not exist at the time either representation commenced, but arose only during the ongoing representation of both clients, where (2) the conflict was not reasonably foreseeable at the outset of the representation, (3) the conflict arose through no fault of the lawyer, and (4) the conflict is of a type that is capable of being waived . . . but one of the clients will not consent to the dual representation.

*Formal Opinion 2005-05: Unforseeable Concurrent Client Conflicts*, New York City Bar, (July 1, 2005), https://www.nycbar.org/reports/formal-opinion-2005-05-unforeseeable-concurrent-client-conflicts/.

Although the New York City Bar Association's standard is not "binding" on this Court, its approach is instructive and persuasive. *See* Kristen Salvatore DePalma & Emily V. Burton, *Engaging with the Realities of the Corporate Family*, 12 Delaware L. Rev. 133, 171-172 (2011) (discussing the application of the approach in other jurisdictions). The Report utilized this approach and found that "the conflict asserted by Teneobio was not reasonably foreseeable, nor was it created in the first instance through any fault of DLA." (D.I. 70 at 12). The Court agrees with the Report's method of analysis although it ultimately comes to a different conclusion.

First, in August 2021,[8] the conflict was "reasonably foreseeable," and thus the second element is not met. On July 27, 2021, Amgen announced its plan to acquire Teneobio. Amgen's press release stated, "it will acquire all outstanding shares of Teneobio at closing in exchange for a $900 million upfront cash payment, as well as future contingent milestone payments to Teneobio equity holders potentially worth up to an additional $1.6 billion in cash." (D.I. 42 Ex. 1 at 2). Therefore, as of July 27, 2021, it was "reasonably foreseeable" Teneobio would become a wholly-owned subsidiary of Amgen.[9]

---

[8]    The Court observes that the parties argue over which date the Court should assess when the conflict became foreseeable. (*See* D.I. 76 at 10). The Court, however, will follow the clear language of the New York Bar Association's test, and will analyze whether the conflict was "reasonably foreseeable *at the outset of the representation*." The outset of representation was in August of 2021. (D.I. 50 at 9).

[9]    When a company purchases all of a target company's shares, the target company becomes a wholly-owned subsidiary of the buyer.

On August 6, 2021, DLA was contacted about representing Harbor in the present action against Teneobio. (D.I. 50 at 9). Then, on August 18, 2021, DLA began billing time to this matter. (*Id.*). Although DLA's representation started nearly three weeks *after* Amgen had announced the planned acquisition, DLA claims that "it was unknown whether the deal would close and, if so, whether Amgen would allow Teneobio to operate as an independent subsidiary or instead would effectively merge Teneobio into its operations." (*Id.*). The Court, however, does not find the inherent uncertainty of corporate mergers and acquisitions to be significant here. A conflict is only "thrust upon" a lawyer if it is "not reasonably foreseeable" – the standard does not require perfect certainty. Where a company announces that it intends to make a financially significant acquisition through acquiring all of an entity's outstanding shares, it is foreseeable that the acquired entity may be totally or completely integrated into the acquirer. Ultimately, "[w]hile the Court acknowledges that it is difficult to foresee *how* the parties may realign [in a merger or acquisition], it is certainly foreseeable that they *would* realign" in the merger or acquisition. *FMS Inv. Corp. v. United States*, 137 Fed. Cl. 99, 104 (Fed. Cl. 2018) (finding the "thrust upon" doctrine did not apply to a bid-protest conflict and the law firm should be disqualified). Therefore, the Court concludes that DLA may not benefit from the "thrust upon" doctrine because it does not meet the second element.

Additionally, the Court finds that DLA cannot benefit from the "thrust upon" doctrine because the conflict did not arise through "no fault of [DLA]." Rather, "the representation of adverse interests occurred when [DLA] investigated, drafted, and filed the complaint in this case." *Flying J Inc.*, 2008 WL 648545 at *17. Following the publicly-announced closing on October 19, 2021, DLA proceeded in its representation of Harbour without inquiring into the potential conflict. It is evident DLA knew that its representation of Harbour could materially

13

impact its client, Amgen, because DLA wrote in the complaint for this action that Amgen had acquired Teneobio for "more than $2.5 billion." (D.I. 1 ¶ ¶ 4, 56). Although it is true that a lawyer is not *per se* prohibited from representing a party adverse to the subsidiary of a corporate client, the duties of loyalty and confidentiality require that the lawyer take affirmative steps to ensure that the line has not been crossed. *See, e.g., JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F. Supp.2d 20, 21 (S.D.N.Y. 2002) ("Even in an age of convenience, for a law firm to bring a multi-million dollar claim on behalf of one corporate client against the primary subsidiary of another of that law firm's corporate clients might be expected to raise some eyebrows."). Indeed, the burden to avoid conflicts and mitigate their potential effects undeniably remains with the lawyer undertaking the representation.[10] *See Strickland v. Washington*, 466 U.S. 668, 692 (1984) ("[C]ounsel owes the client a duty a loyalty, [and] a duty to avoid conflicts of interest" – "perhaps the most basic of counsel's duties."). The Court observes the record is devoid of evidence that DLA took any steps to ensure that it had not breached the duty of loyalty or the duty to avoid conflicts. (*See* D.I. 71 at 14 ("[DLA] did not seek consent. It did not ask whether Amgen would fully integrate Teneobio into its operation.")). Regrettably, months after the Complaint was filed, it was Amgen, the client, who informed DLA that there was an apparent conflict of interest. (*Id.* at 4-5 (citing D.I. 42, Exs. 11, 12)). Therefore, the Court cannot find that the conflict arose through no fault of DLA and the "thrust upon" exception cannot mitigate its conduct.

---

[10]    Even where a conflict arises in the middle of a representation, it is the lawyer's duty to mitigate the effects of that potential conflict. *See, e.g.*, Rule 1.7, Comment [4] ("If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client . . ..").

### C.    DLA is not Disqualified from Representing Harbour in this Action

Third, and last, Teneobio objects to the Report's conclusion that disqualification was not warranted.

At the outset, the Court acknowledges that DLA's conduct has been far from exemplary. Nevertheless, the Court must approach the disqualification motion with "a keen sense of practicality as well as a precise picture of the underlying facts." *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1124 (N.D. Ohio 1990). In following the Delaware Lawyer's Code of Professional Responsibility and the Ethical Considerations adopted by the American Bar Association, the Court should only grant a motion to disqualify where it "is an appropriate means of enforcing the applicable disciplinary rule." *Brotherhood Ry. Carmen v. Delpro Co.*, 549 F.Supp. 780, 786 (D. Del. 1982). This rule, however, must be tempered by "countervailing policies, such as, permitting a litigant to retain counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.* (citing *Miller*, 624 F.2d at 1201). The Report, in relevant part, reasoned:

> Courts, including the District of Delaware, have "often employed a balancing test in determining the appropriateness of the disqualification of an attorney," *TQ Delta*, 2016 WL 5402180 at *6, and "carefully examine the totality of the circumstances . . . including the impact, nature and degree of a conflict." *Wyeth v. Abbott Laboratories*, 692 F. Supp. 2d 453, 457 (D.N.J. 2010). Among the factors examined by courts are: (1) prejudice to the parties; (2) overlap in the substance of the engagements or the attorneys working on same; (3) access by the attorney from prior or current engagements to confidential information relevant to this litigation; (4) the complexity of the issues in the case and the expense and time it would take for new counsel to get up to speed; (5) any indicia of ulterior motives, either by the timing of the Motion or the concurrent engagements; and (6) the effectiveness of alternative remedies in protecting the integrity of the judicial process. *See, e.g., Wyeth*, 692 F. Supp. 2d. at 459; *TQ Delta*, 2016 WL 5402180 at *6; transcript at 58-59.

15

**Prejudice**. In weighing the first factor, Teneobio/Amgen will be deprived of the loyalty that DLA owes to its clients if disqualification is not granted, and will lose the peace of mind that is associated with loyalty. If disqualification is granted, Harbour will be deprived of experienced counsel who has already invested substantial time in this complex litigation. I note in this regard, however, that the litigation is in its early stages. I find this factor weighs in favor of disqualification.[11]

**Overlap**. I can discern no overlap – substantively or by DLA lawyers - between this litigation and DLA's prior and current engagements with Amgen. This factor weighs against disqualification.

**Confidential information**. There is no indication of record that any of Amgen's confidential information that DLA may have accessed through other engagements has any relevance to the instant litigation. (D.I. 51, ¶20; D.I. 53, ¶ 6; D.I. 54, ¶ 5) This factor weighs against disqualification.

**Complexity**. Patent litigation is complex. Although there is not a scarcity of patent attorneys to pick up a case, the fact remains that conflicts are a hurdle and much of the work done for a patentee in a case is done before the complaint is even filed. In other words, it would take time and money to replace DLA, even at this stage of the litigation. This factor weighs against disqualification.

**Ulterior motives**. I observe that both Harbour and Teneobio have ascribed ulterior motives to each other in the context of the Motion. Teneobio has suggested that Amgen is actually the target of the patent infringement suit (based on the timing of the litigation 9), tending to prove the merits of Teneobio's corporate interrelatedness contention. Harbour has suggested that the Motion was filed months after litigation commenced and not until settlement negotiations had broken down, tending to prove either that Teneobio and Amgen are not really interrelated or that the Motion is nothing more than a disfavored litigation strategy. Other than timing, however, none of these accusations are bolstered by any proof and, therefore, carry no weight.

---

[11]    On October 16, 2024, the Parties filed a stipulation which informed the Court that Plaintiffs "are in the process of changing counsel . . .." (D.I. 160 at 1).  Accordingly, the Court does not find that this impacts Special Master Robinson's conclusion that this factor weighs in favor of disqualification.

> **Integrity of the judicial process.** Rule 1.7(a) was enacted "to prevent divided loyalties and to protect against the disclosure of client confidences." *End of Road Trust v. Terex Corp.*, 2002 WL 242464 (D. Del. Feb. 20, 2002), at *3 (citing *IBM v. Levin*, 579 F.2d 271, 280 (3d Cir. 1978)). As noted above, there is no indication of record that DLA's representation of Harbour will "materially interfere with [its] independent professional judgment" in representing Amgen in unrelated matters, or that any client confidences have been shared between the DLA attorneys representing Harbour and any other DLA Piper (US) attorneys. *Elonex*, 142 F. Supp. 2d at 583-84. Moreover, on June 6, 202[2], Harbour put in place a precautionary screen between the DLA Piper (US) attorneys representing Harbour and all other DLA Piper (US) attorneys representing Amgen in active matters for Amgen. (D.I. 52, ¶ 17) Harbour has offered to retain conflict counsel. Consistent with Formal Opinion 2005-05 of the New York City Bar, DLA also has "the option to withdraw from one of the representations in order to avoid the conflict." *Id.* at 9. In sum, the integrity of the judicial process can be adequately protected by alternative remedies to disqualification.[12]

(D.I. 70 at 15) (internal footnotes omitted).

The reasoning of the Report is sound and supported by a thorough analysis of the record and the relevant law. Upon conducting *de novo* review, the Court comes to similar conclusions. The Court places a particular emphasis on the lack of overlap and confidential information that could taint the proceedings. (*See also* D.I. 76 at 13 ("(1) there is no indication DLA's representation of Harbour will materially interfere with its representation of Amgen, (2) there is no evidence confidences have been shared between DLA attorneys representing Harbour and other DLA attorneys, and (3) Harbour has offered to retain conflicts counsel.")). "[T]his patent case is wholly unrelated to DLA's representation of Amgen in other matters." (D.I. 50 at 22; *see also* D.I. 72, Ex. 1 at 18:8-11 ("[Teneobio] is not suggesting that the matters in which [DLA]

---

[12]    Indeed, the parties have seemed to pursue an alternative remedy to disqualification as described in the stipulation submitted October 16, 2024. (*See* D.I. 160); *see also supra* note 1.

represent[s] Amgen currently are substantially related in subject matter to the Harbour litigation . . ..."); *id.* at 42:23-43:1 (DLA stating that Amgen's former engagements with DLA for intellectual property matters had expired "years ago.")).  Furthermore, DLA has instituted an ethical screen. (*Id.* at 64:25-65:1).  This Court has previously determined that notwithstanding a violation of Rule 1.7, "disqualification would not be warranted where, *inter alia*, the law firm's concurrent representations were in unrelated matters; were 'being done out of different offices in different cities;' and were being done with an ethical wall in place between the two matters."  *Boston Sci. Corp.*, 647 F.Supp.2d at 374 (quoting *Elonex*, 142 F.Supp.2d at 583-84).  As a result, in exercising its discretion, the Court does not find that disqualification is warranted and adopts the Report's conclusion.[13]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Teneobio's objection to the Report's denial of its disqualification motion is DENIED and the Report's conclusion is ADOPTED.  An appropriate order will follow.

---

[13]    "The breach of the ethical obligation to notify clients of a conflict of interest, and either obtain consent or withdraw from the representation is a serious matter."  *Gould*, 738 F.Supp. at 1127.  While disqualification was not the appropriate remedy in this case, the Court encourages all counsel to review their ethical obligations and proactively assume the duties therein.