# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARBOUR ANTIBODIES BV, HARBOUR ANTIBODIES HCAB BV, ERASMUS UNIVERSITY MEDICAL CENTER ROTTERDAM and DR. ROGER KINGDON CRAIG, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1807 (MN) |
| | ) | |
| TENEOBIO, INC. and AMGEN INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| TENEOBIO, INC. and AMGEN INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Counterclaim-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARBOUR ANTIBODIES BV, HARBOUR ANTIBODIES HCAB BV, ERASMUS UNIVERSITY MEDICAL CENTER ROTTERDAM, DR. ROGER KINGDON CRAIG, and HBM HOLDINGS LTD. | ) ) ) ) ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF HARBOUR'S
<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

Page

HARBOUR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE RETROACTIVE ASPECTS OF TENEOBIO'S LICENSE DEFENSES ......................................1

I.      LEGAL STANDARD.................................................................................................1

II.     ARGUMENT..............................................................................................................2

        A.      The Court Should Categorically Reject Amgen's Attempt To Grant
                Retroactive Sublicenses To Teneobio...........................................................2

        B.      As A Matter Of Contract Interpretation, Amgen Did Not Have The Right
                To Grant Retroactive Sublicenses..................................................................4

        C.      Even If Amgen Had Retroactive Sublicensing Rights, It Did Not Have The
                Right To Sublicense Teneobio Back To 2015 For All Antibodies..........................6

III.    CONCLUSION...........................................................................................................8

HARBOUR'S MOTION FOR SUMMARY JUDGMENT  OF NO TORTIOUS
INTERFERENCE ........................................................................................................8

I.      LEGAL STANDARD.................................................................................................8

II.     ARGUMENT..............................................................................................................9

        A.      Amgen's State Law Tortious Interference Claim Is Preempted By Federal
                Patent Law. ....................................................................................................9

        B.      Amgen Asserts Its Counterclaim Against Affiliated Entities That Cannot
                Be Liable For Tortiously Interfering With Each Other's Contracts. ....................11

        C.      Amgen Cannot Identify Any Evidence To Prove The Intent Element Of Its
                Claim For Tortious Interference. ........................................................................12

        D.      Amgen Cannot Prove Damages. ........................................................................13

III.    CONCLUSION...........................................................................................................13

HARBOUR'S MOTION FOR SUMMARY JUDGMENT OF NO FRAUD IN THE
INDUCEMENT ...........................................................................................................14

I.      LEGAL STANDARD.................................................................................................14

II.     ARGUMENT..............................................................................................................14

A.      Amgen Cannot Prove The Knowledge Element Of Its Counterclaim For
        Fraud In The Inducement. ..........................................................................................14

B.      Amgen's Fraud In The Inducement Claim Is Improperly Duplicative Of Its
        Claims For Breach Of Contract. ...............................................................................17

III.    CONCLUSION......................................................................................................................19

HARBOUR'S MOTION FOR SUMMARY JUDGMENT OF NO
UNENFORCEABILITY................................................................................................................19

I.      LEGAL STANDARD............................................................................................................19

II.     ARGUMENT..........................................................................................................................20

A.      As A Matter Of Law, Defendants Cannot Meet The "But-For" Materiality
        Requirement Based On Omitted Inventorship Information...................................20

B.      Defendants Have Not Pled Any Inequitable Conduct Theory Other Than
        "But-For" Materiality...............................................................................................21

III.    CONCLUSION......................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*800 Adept, Inc. v. Murex Secs., Ltd.*,
  539 F.3d 1354 (Fed. Cir. 2008)......................................................................................9, 11

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  No. 16-cv-00453-RGA, 2017 WL 3668597 (D. Del. Aug. 24, 2017) ......................................3

*Auxilium Pharms., Inc. v. Watson Lab'ys, Inc.*,
  No. 12-3084 (JLL), 2014 WL 9859224 (D.N.J. Dec. 16, 2014)..............................................21

*Baker v. Safeco Ins. Co. of Am.*,
  175 F.3d 618 (8th Cir. 1999) .................................................................................................10

*Balaji Hosp. Grp. v. Travelers Indem. Co. of Am.*,
  No. 3:18-cv-00816-DRL, 2020 WL 887916 (N.D. Ind. Feb. 20, 2020)..................................10

*Bohle, Inc. v. Shore Invs., Inc.*,
  67 A.3d 444 (Del. 2013) ...........................................................................................................9

*Bridgestone/Firestone v. Recovery Credit Servs.*,
  98 F.3d 13 (2d Cir. 1996)........................................................................................................18

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
  No. 16-cv-03714-GW, 2019 WL 8807748 (C.D. Cal. July 1, 2019)......................................23

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
  25 F.4th 976 (Fed. Cir. 2022) .................................................................................................23

*Canon Inc. v. Tesseron Ltd.*,
  146 F.Supp.3d 568 (S.D.N.Y. 2015)......................................................................................3, 4

*CapLOC, LLC v. McCord*,
  No. 17-cv-05788 (AT), 2018 WL 3407708 (S.D.N.Y. June 12, 2018) ...................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................................13

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
  773 F.3d 110 (2d Cir. 2014).......................................................................................................5

*CNH Am. LLC v. Kinze Mfg., Inc.*,
  809 F.Supp.2d 280 (D. Del. 2011)......................................................................................10, 11

*CSB-Sys. Int'l Inc. v. SAP Am., Inc.*,
  No. 10-cv-02156, 2012 WL 1645582 (E.D. Pa. May 10, 2012)..............................................23

*DelDuca v. DelDuca*,
  758 N.Y.S.2d 145 (N.Y. App. Div. 2d Dept. 2003) ................................................................5

*Dexcowin Glob., Inc. v. Aribex, Inc.*,
  No. 16-cv-00143-GW(AGRx), 2017 WL 3477748 (C.D. Cal. June 7, 2017)........................21

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020)............................................................................................20

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998)..............................................................................................3

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009)............................................................................................22

*Fido's Fences v. Canine Fence Co.*,
  No. 08-cv-00754 (LDW) (AKT), 2009 WL 10709094 (E.D.N.Y. Oct. 5, 2009)....................10

*Finjan, Inc. v. Symantec Corp.*,
  No. 10-cv-00593 (GMS), 2013 WL 5302560 (D. Del. Sep. 19, 2013) .............................10, 11

*Grape Tech. Grp., Inc. v. Jingle Networks, Inc.*,
  841 F.Supp.2d 845 (D. Del. 2012)...................................................................................10, 11

*Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*,
  906 F.Supp.2d 96 (E.D.N.Y. 2012) ..................................................................................15, 16

*Heritage Found. v. U.S. DOJ*,
  No. 24-cv-00053 (MN), 2025 WL 2781704 (D. Del. Sep. 30, 2025).....................................2

*Horowitz v. Fed. Kemper Life Assurance Co.*,
  57 F.3d 300 (3d Cir. 1995)......................................................................................................1

*Imtrac Indus. v. Glassexport Co.*,
  No. 90-cv-06058, 1996 WL 39294 (S.D.N.Y. Feb. 1, 1996) ................................................11

*James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*,
  No. 3637-VCL, 2009 WL 1638634 (Del. Ch. June 11, 2009)................................................12

*Judd Burstein, P.C. v. Long*,
  180 F.Supp.3d 308 (S.D.N.Y. 2016).......................................................................................4

*Kaufman v. Alexander*,
  62 F.Supp.3d 395 (D. Del. 2014).........................................................................................13

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
  656 F. App'x 504 (Fed. Cir. 2016) .......................................................................................17

iv

*Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*,
  No. 06-cv-00601-JJF, 2009 WL 2524577 (D. Del. Aug. 17, 2009) .......................................23

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (N.Y. 1996) ............................................................................... 8-9, 13

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
  639 F.3d 63 (2d Cir. 2011)...................................................................................................4

*Logfret, Inc. v. Gerber Fin., Inc.*,
  559 F.Supp.3d 348 (S.D.N.Y. 2021)...............................................................................14, 15

*Masefield AG v. Colonial Oil Indus.*,
  No. 05-cv-02231, 2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) .............................................11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................................2

*McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*,
  No. 89-cv-01489 (PNL), 1990 WL 138959 (S.D.N.Y. Sep. 14, 1990) ..................................18

*MHR Cap. Partners LP v. Presstek, Inc.*,
  12 N.Y.3d 640 (2009) ..........................................................................................................4

*Orient Express Trading Co. v. Federated Dep't Stores, Inc.*,
  842 F.2d 650 (2d Cir. 1988)................................................................................................15

*Pac-West Distrib. NV LLC v. AFAB Indus. Servs., Inc.*,
  674 F.Supp.3d 132 (W.D. Pa. 2023).....................................................................................16

*Rockhill Ins. Cos. v. CSAA Ins. Exch.*,
  No. 3:17-cv-00496-HDM-WGC, 2019 WL 3767466 (D. Nev. Aug. 9, 2019) .......................10

*Schering Corp. v. Roussel-UCLAF SA*,
  104 F.3d 341 (Fed. Cir. 1997)........................................................................................... 2-3

*Skillz Platform Inc. v. Aviagames Inc.*,
  No. 21-cv-02436-BLF, 2023 WL 6542147 (N.D. Cal. Oct. 6, 2023)....................................23

*Stamicarbon, N.V. v. Chem. Constr. Corp.*,
  401 F.Supp. 384 (D. Del. 1975), *rev'd on other grounds* 544 F.2d 645 (3d Cir.
  1976) ..................................................................................................................................17

*State St. Glob. Advisors Tr. Co. v. Visbal*,
  431 F.Supp.3d 322 (S.D.N.Y. 2020)....................................................................................18

*Therasense, Inc. v. Becton, Dickinson and Co.*,
  649 F.3d 1276 (Fed. Cir. 2011)................................................................................... *passim*

*Travel Syndication Tech., LLC v. Fuzebox, LLC*,
   No. 11-cv-0553-RGA-SRF, 2012 WL 1931238 (D. Del. May 25, 2012) ...............................12

*U.S. v. Jimenez*,
   513 F.3d 62 (3d Cir. 2008)......................................................................................................15

*W.B. David & Co. v. DWA Commc'ns, Inc.*,
   No. 02-cv-08479 (BSJ), 2004 WL 369147 (S.D.N.Y. Feb. 26, 2004) ...................................17

*Warman v. Loc. Yokels Fudge, LLC*,
   No. 19-cv-1224, 2022 WL 17960722 (W.D. Pa. Dec. 27, 2022) ...........................................16

*Williams v. West Chester*,
   891 F.2d 458 (3d Cir. 1989).....................................................................................................2

*World of Boxing, LLC v. King*,
   634 F. App'x 1 (2d Cir. 2015) ................................................................................................19

*Wu v. Arouh*,
   No. 14-cv-03902, 2016 WL 9772214 (E.D. Pa. Mar. 8, 2016) ..............................................10

*Zenith Elecs. Corp. v. Exzec, Inc.*,
   182 F.3d 1340 (Fed. Cir. 1999)................................................................................................9

**RULES**

Fed. R. Civ. P. 56(a) .......................................................................................................................1

Plaintiffs and Counterclaim-Defendants Harbour Antibodies BV ("HBV"), Harbour Antibodies HCAb BV ("HBAB"), HBM Holdings Ltd. ("HBM"), and Erasmus University Medical Center Rotterdam ("Erasmus") (collectively, "Plaintiffs" or "Harbour") file this omnibus brief in support of their four summary judgment motions against Defendants and Counterclaim-Plaintiffs Teneobio, Inc. ("Teneobio") and Amgen Inc. ("Amgen") (collectively, "Defendants").

**HARBOUR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE
RETROACTIVE ASPECTS OF TENEOBIO'S LICENSE DEFENSES**

Teneobio began infringing Harbour's patents in 2015. By 2024, Teneobio's infringement had caused Harbour approximately $200 million in damages. At that point, nine years after Teneobio began its infringing conduct, it executed sublicenses with Amgen. Teneobio now contends that those sublicenses retroactively wiped out all of its liability for nearly a decade of infringing conduct. That, however, is not consistent with the law. Thus, Harbour moves for partial summary judgment on Teneobio's license defense for the period before signing the sublicenses on July 12, 2024.[1] *See* D.I. 332 at 38-39 (Ninth and Tenth Affirmative Defenses).

## I.    LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance*

---

[1] Amgen asserts its own license defense based on the 2013 HCAb License Agreement, under which Amgen purports to have sublicensed Teneobio. **SOF 33-38**. Harbour denies that the HCAb License Agreement expressly or impliedly protects Amgen from liability for any infringing activity or gave Amgen the right to grant the sublicenses to Teneobio in the first place. However, Harbour acknowledges that the parties have disputes on those issues. Accordingly, this summary judgment motion is directed to the retroactivity component of Teneobio's purported sublicense.

*Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  "If the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial."  *Heritage Found. v. U.S. DOJ*, No. 24-cv-00053 (MN), 2025 WL 2781704, at *3 (D. Del. Sep. 30, 2025) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## II.    ARGUMENT

The Court should grant partial summary judgment in Harbour's favor on the retroactive aspects of Teneobio's license defense for three alternative independent reasons.  ***First***, based on well-established concerns about the dangers of retroactive patent licensing, the Court should categorically reject Amgen and Teneobio's litigation-driven attempt to wipe out nearly a decade of damages.  ***Second***, even if retroactive sublicensing is not categorically prohibited, in this case Amgen did not have the right to grant retroactive sublicenses under the HCAb License Agreement it executed with Harbour in 2013.  And ***third***, even if the HCAb License Agreement gave Amgen the right to retroactively sublicense in certain circumstances, the earliest date it could have granted such a sublicense to Teneobio was the time of its acquisition in 2021 and even then, only for antibodies that were originally discovered or generated by Amgen.  As explained below, each of those reasons independently supports partial summary judgment in Harbour's favor.

### A.    The Court Should Categorically Reject Amgen's Attempt To Grant Retroactive Sublicenses To Teneobio.

The Federal Circuit has recognized that the law simply cannot allow a defendant in a patent suit to make an end run around past damages owed to a plaintiff by seeking out a retroactive license from a different entity authorized to license the patent.  For example, in *Schering Corp. v. Roussel-*

*UCLAF SA*, the court expressed concern that a retroactive license could "render the unilateral right to sue valueless." 104 F.3d 341, 346 (Fed. Cir. 1997). A year later in *Ethicon, Inc. v. U.S. Surgical Corp.*, the court expressed similar concerns and prohibited a retroactive release of an infringer "from its liability for past accrued damages." 135 F.3d 1456, 1467 (Fed. Cir. 1998).

Here, Amgen and Teneobio have engaged in a scheme that raises those exact concerns. Teneobio began infringing in 2015, at which time Teneobio did *not* have a license to the Asserted Patents. **SOF 17, 21-22**. It was not until 2024—three years after Harbour filed this litigation in which it contends that Teneobio's willful infringement caused damages of $200 million—that Teneobio first purports to have received sublicenses from Amgen. **SOF 19, 22, 33**. Now Teneobio contends that those 2024 sublicenses immunize it from liability for all damages dating back to 2015.[2] Under the principles in *Schering* and *Ethicon*, this Court should reject that argument.

Teneobio would undoubtedly attempt to distinguish *Schering* and *Ethicon* by emphasizing that Amgen was not a "co-owner" of the Asserted Patents, but rather Harbour's licensee.[3] And it is true that some courts have limited *Schering* and *Ethicon* to the "co-owner" context and declined to extend the reasoning to the sublicense context. *See, e.g.*, *Canon Inc. v. Tesseron Ltd.*, 146 F.Supp.3d 568, 577 (S.D.N.Y. 2015) ("Accordingly, the discussions in Ethicon and Davis are properly understood as discussions of the scope of licensing rights in the context of co-ownership, not sole ownership, and not as indications of intent to restrict a sophisticated patent holder's right to negotiate and issue a broad license agreement granting both retrospective and prospective rights."); *see also Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. 16-cv-00453-RGA, 2017

---

[2] Tellingly, Amgen has not identified or even alleged that it granted any other sublicense under the 2013 HCAb License Agreement. **SOF 21, 23**.

[3] Again, Harbour disputes that Amgen was a licensee at the time it purports to have granted the sublicenses, but that issue is not the subject of this motion.

WL 3668597, at *4 (D. Del. Aug. 24, 2017) (citing *Canon*).

This case, however, raises precisely the concerns that the Federal Circuit expressed in *Schering* and *Ethicon*. Harbour entered into the HCAb License Agreement with Amgen in 2013,

███████████████████████████████████████████████████████████████████

██████████████████████████████████████. **SOF 1-5**. Then, in 2024—eleven years later, long after Amgen destroyed the mice (**SOF 22, 24, 33-38**)—Amgen attempted to use that license to render valueless Harbour's right to enforce its patents against Teneobio, a company that had nothing to do with the original Amgen license, and had been independently infringing Harbour's patents for years. The law does not support such tactics, and this Court should grant summary judgment for Harbour on the retroactive aspects of Teneobio's license defense.

**B.    As A Matter Of Contract Interpretation, Amgen Did Not Have The Right To Grant Retroactive Sublicenses.**

Even if this Court declines to extend the holdings of *Schering* and *Ethicon* to categorically prohibit retroactive sublicensing, Amgen's retroactive sublicenses to Teneobio still fail here. At most, the case law suggests that "whether a license or sublicense may have retroactive effect depends on whether the licensor has conferred that right[, which] is a question of contract interpretation." *Canon*, 146 F. Supp. 3d at 577. Thus, the question would be whether Amgen had the right under the HCAb License Agreement—interpreted under New York law (**SOF 8**)—to grant retroactive sublicenses. The language of the agreement did not give Amgen that right.

Under New York law, "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Judd Burstein, P.C. v. Long*, 180 F.Supp.3d 308, 311–12 (S.D.N.Y. 2016) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)). The parties' intentions are "discerned from the four corners of the document itself." *Id.* at 312 (citing *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009)). When

4

determining the intent of the parties, "the words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and brackets omitted).

Here, Amgen purports to have derived its "Sublicensing Rights" from Sections 2.1(b) and 2.2 of the HCAb License Agreement. **SOF 29**. Importantly, the language in those sections did not grant Amgen—either expressly or implicitly—the right to *retroactively* sublicense any third-party entity. **SOF 5-7**. On the contrary, the entirety of Section 2.2 was written prospectively, which demonstrates that retroactive sublicensing was ***not*** allowed. *See* **SOF 6-7.**

For example, . **SOF 3-5**. But it would have obviously been nonsensical for such a right to apply retroactively because, as a practical matter, . In view of that practical reality, See, e.g., *DelDuca v. DelDuca*, 758 N.Y.S.2d 145, 146 (N.Y. App. Div. 2d Dept. 2003) ("When interpreting a contract, . . . the document must be read as a whole to determine the parties' intent, ***giving a practical interpretation*** to the language employed so that the parties' reasonable expectations are realized.").

Even if Amgen's sublicensing rights were viewed in isolation, the relevant language in Section 2.2 was contingent on ***future*** events occurring. *See* **SOF 6**. For example, Amgen only had sublicensing rights to **SOF 6**. To be sure,

█████████████████████████████████████████████—but it did not.

Moreover, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    **SOF 6**.    █████████████████████████████████

████████    That is, it would be impossible for any third party to have retroactively known about and complied with Amgen's obligations under the HCAb License Agreement.  And it would have been impossible for Harbour to police the past compliance of such third party.

At bottom, Amgen did not have the right under the plain meaning of the HCAb License Agreement to grant retroactive sublicenses.  For that reason, the Court should grant partial summary judgment in Harbour's favor on the retroactive aspects of Teneobio's license defense.

### C.    Even If Amgen Had Retroactive Sublicensing Rights, It Did Not Have The Right To Sublicense Teneobio Back To 2015 For All Antibodies.

Alternatively, even if the HCAb License Agreement gave Amgen retroactive sublicensing rights, Amgen's sublicensing rights were limited by at least two restrictions in the HCAb License Agreement: (1) limits to specific third parties; and (2) limits to specific antibodies.

*First*, Amgen's right to sublicense under Section 2.1(b) was limited to specific categories of third parties, including ███████████████████████████████████

████████████████████████████████████████████    **SOF 3**.

Teneobio did not become an Affiliate of Amgen until 2021.  **SOF 20**.  Before that, Teneobio did not fall within any category of "Third Party" to which Amgen had sublicensing rights.

Amgen and Teneobio attempted to circumvent that problem by characterizing a ████

███████████████████████████████████████    **SOF 29**.  But that MTA stated unequivocally ██████████████████████████████████

████████    **SOF 16**.  Thus, having made clear in ████ that the MTA ████████████████

6

██████████████████████████████████, Amgen and Teneobio should not be heard to claim that the Sublicense Agreements they entered ███████████ retroactively gave Teneobio the right to practice Harbour's patents due to ████████████

Moreover, the ███████████ was a █████████████████████████████████████████████████████████████████████████████ **SOF 15**. The total compensation paid under the █████ was ███████████████████████████████████████████████████ **SOF 14**. Teneobio's position, distilled to its essence, is that by virtue of an agreement under which it was paid ███████████ of money in connection with ███████████████████, it somehow was granted immunity from liability for hundreds of millions of dollars' worth of infringement of Harbour's patents. That position strains credulity, and the Court should reject it.

What is more, Amgen and Teneobio were fully aware that their attempt in 2024 to retroactively license Teneobio back to 2015 would not hold up to a bare minimum of scrutiny. That awareness is the only plausible explanation for their decision to execute ***two separate*** Sublicense Agreements, one retroactive to ███████████ and the other retroactive to Amgen's acquisition of Teneobio in 2021. **SOF 22, 26, 28**. Said differently, the 2021 retroactivity is entirely redundant of the 2015 retroactivity, and there was thus no reason—other than litigation-driven tactics—for Amgen and Teneobio to execute both Sublicense Agreements.

***Second***, Amgen's right to grant sublicenses under Section 2.1(b) was limited in scope to ███████████████████████████████████ which are defined as antibodies and products that were ██████████████████████████████████████████ **SOF 2, 4**. Thus, Section 2.2 allowed Amgen, at most, to sublicense third parties that ███████████████████████████████████████████████████████████████████████████. Because Amgen did not ███████████████████████████████████████ the Teneobio HCAbs that are at issue in this case,

Amgen's sublicense rights cannot extend to those antibodies and products. **SOF 2, 12-13, 17-18**.

Ultimately, the Court should reach the conclusions above that Amgen had no retroactive sublicensing rights whatsoever under the HCAb License Agreement. But, to the extent Amgen had any right at all to grant retroactive sublicenses to Teneobio, that right would only extend back to Amgen's acquisition of Teneobio in 2021 and would not extend to antibodies originally discovered or generated by Teneobio.

## III.    CONCLUSION

The Court should grant partial summary judgment on Teneobio's Ninth and Tenth Affirmative Defenses for the period before Teneobio's Sublicense Agreements on July 12, 2024.

**HARBOUR'S MOTION FOR SUMMARY JUDGMENT**
**OF NO TORTIOUS INTERFERENCE**

Amgen's counterclaim for tortious interference fails for at least four reasons. First, Amgen's state law tortious interference claim is preempted by federal patent law. Second, Amgen accuses affiliated entities that are immune from claims that they have tortiously interfered with each other's contractual relationships. Third, Amgen cannot point to any evidence to show the intent element of tortious interference. And fourth, Amgen cannot show that Harbour caused any damages. For those reasons, the Court should grant summary judgment for Harbour on Amgen's counterclaim for tortious interference. D.I. 332 at 58 (Count XI).

## I.    LEGAL STANDARD

Proving tortious interference under New York law requires: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) "the defendant's knowledge of that contract"; (3) "the defendant's intentional procurement of the third-party's breach of that contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Lama*

8

*Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996) (citations omitted).[4]

## II.    ARGUMENT

### A.    Amgen's State Law Tortious Interference Claim Is Preempted By Federal Patent Law.

"State tort claims against a patent holder, including tortious interference claims, based on enforcing a patent in the marketplace, are 'preempted' by federal patent laws, unless the claimant can show that the patent holder acted in 'bad faith' in the publication or enforcement of its patent." *800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008); *see also Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999) ("[T]o avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim.") (citation omitted).  Here, Amgen has no evidence to prove that Harbour acted in bad faith.  Thus, Amgen's tortious interference counterclaim is preempted.

Amgen's counterclaim alleges that Harbour's bad faith is demonstrated by Harbour's conduct ***in this litigation***, specifically Harbour's motion to amend its Complaint to add Amgen. *See* D.I. 332 at 58 (¶ 102) (Amgen's counterclaim, asserting that Harbour moved to amend its Complaint to add Amgen "despite Harbour's knowledge that Amgen has a license to the Asserted Patents under the HCAb License Agreement"); **SOF 60, Ex. 17** (Amgen's interrogatory response, which contends that HBM's and HBV's alleged "bad faith is demonstrated by Harbour's motion to amend the Complaint to add Amgen as a defendant at a late stage in the proceedings, asserting infringement claims against Amgen and seeking damages").  But the parties have bona fide disputes regarding multiple aspects of Amgen's license defense.  And Harbour's reasonable good-

---

[4] Amgen does not identify the jurisdiction under which it brings its tortious interference counterclaim. *See* D.I. 332 at 58-60 (¶¶ 97-104).  Because the HCAb License Agreement is governed by New York law, Harbour applies that law here.  Notably, to the extent Amgen contends that Delaware law applies, the elements of a claim for tortious interference are substantially similar. *See, e.g.*, *Bohle, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

faith litigation positions cannot—as a matter of law—be evidence of bad faith. *See, e.g.*, *Finjan, Inc. v. Symantec Corp.*, No. 10-cv-00593 (GMS), 2013 WL 5302560, at *40 (D. Del. Sep. 19, 2013) ("[T]he parties defended their respective positions throughout this litigation in apparent good faith and the court does not find evidence in the record sufficient to support the assertion that [plaintiff] acted in subjective bad faith . . . ."); *see also, e.g.*, *Grape Tech. Grp., Inc. v. Jingle Networks, Inc.*, 841 F.Supp.2d 845, 860 (D. Del. 2012) (rejecting accusations of bad faith because "both sides defended their respective positions throughout this litigation in apparent good faith"); *CNH Am. LLC v. Kinze Mfg., Inc.*, 809 F.Supp.2d 280, 295 (D. Del. 2011).[5]

***First***, Harbour contends that Amgen is not licensed ***at all*** under the HCAb License Agreement. The licenses granted in Section 2.1 were ███████████████████████████ ███████████████████████████████████████ **SOF 41**. It is undisputed that Amgen did ***not*** make ***all*** of those payments. **SOF 46-50**. Amgen made the ███████████████ ██████████████████ and ███████████████████████████████ ███████ **SOF 44-45**. But Amgen did ***not*** make ████████████████████████ ███████████████████████████████████████████████

---

[5] Many courts have recognized that good-faith disputes cannot constitute bad faith. *See, e.g.*, *Baker v. Safeco Ins. Co. of Am.*, 175 F.3d 618, 620 (8th Cir. 1999) ("The record clearly reveals that the delay . . . was the result of a good-faith dispute . . . . We therefore conclude that [the defendant's] conduct in handling [the plaintiff's] claim . . . did not constitute bad faith."); *Balaji Hosp. Grp. v. Travelers Indem. Co. of Am.*, No. 3:18-cv-00816-DRL, 2020 WL 887916, at *4 (N.D. Ind. Feb. 20, 2020) ("[A] good faith dispute about the amount of a valid claim or about whether the insured has a valid claim does not amount to bad faith.") (internal quotation and citation omitted); *Rockhill Ins. Cos. v. CSAA Ins. Exch.*, No. 3:17-cv-00496-HDM-WGC, 2019 WL 3767466, at *3 (D. Nev. Aug. 9, 2019) ("A reasonable, or good faith, dispute does not constitute a bad faith claim.") (citation omitted); *Wu v. Arouh*, No. 14-cv-03902, 2016 WL 9772214, at *13 (E.D. Pa. Mar. 8, 2016) ("Acting upon a reasonable, although incorrect, legal conclusion does not amount to bad faith.") (internal quotation and citation omitted); *Fido's Fences v. Canine Fence Co.*, No. 08-cv-00754 (LDW) (AKT), 2009 WL 10709094, at *6 (E.D.N.Y. Oct. 5, 2009) ("Overall, the Court does not find that Defendant acted in bad faith but, rather, that the parties were engaged in a legitimate and good faith dispute . . . .").

██████████████████████  **SOF 48-50**.  Rather, before the ██████████ ████████ came due, Amgen sent Harbour notice that "Amgen hereby terminates the Agreement."  **SOF 52-53**.  In this litigation, Amgen and Harbour dispute the implications of Amgen's failure to make all of the payments and the implications of Amgen's express termination of the HCAb License Agreement.  But Harbour's reasonable litigation position on those issues cannot support a finding of bad faith.  *See Finjan*, 2013 WL 5302560, at *40; *Grape Tech.*, 841 F.Supp.2d at 860; *CNH*, 809 F.Supp.2d at 295.

*Second*, Harbour contends that, even if Amgen is licensed to the Asserted Patents, the license only protects it from liability in connection with Harbour *Mice* and antibodies discovered using Harbour *Mice*.  But Harbour's infringement contentions in this case are directed at Amgen's *unlicensed* use of the patented methods in *rats*.  **SOF 54**.  Again, the parties dispute the scope of the license, but Harbour's reasonable litigation position does not evince bad faith.  *See Finjan*, 2013 WL 5302560, at *40; *Grape Tech.*, 841 F.Supp.2d at 860; *CNH*, 809 F.Supp.2d at 295.

For the foregoing reasons, Amgen cannot prove that Harbour acted in bad faith when it asserted patent infringement claims against Amgen.  Accordingly, Amgen's state law tortious interference claim is preempted by federal law.  *800 Adept*, 539 F.3d at 1369.

**B.      Amgen Asserts Its Counterclaim Against Affiliated Entities That Cannot Be Liable For Tortiously Interfering With Each Other's Contracts.**

When asserting tortious interference against an affiliate of a contracting party, a plaintiff must prove "more than the basic elements" of tortious interference.  *Masefield AG v. Colonial Oil Indus.*, No. 05-cv-02231, 2006 WL 346178, at *5 (S.D.N.Y. Feb. 15, 2006).  In such a scenario, "under New York law, courts will impose liability only where a plaintiff can show that the interference was either malicious or involved conduct rising to the level of criminality or fraud."  *Id.* (citing *Imtrac Indus. v. Glassexport Co.*, No. 90-cv-06058, 1996 WL 39294, at *7-8 (S.D.N.Y.

11

Feb. 1, 1996) (stating that "one with a financial interest in the business that is subject to the contract is privileged to interfere with the contract in order to protect that self-interest" and granting summary judgment because plaintiff "[had] presented no evidence of malice or illegality")).  In this district, the doctrine has been termed the "affiliate privilege," which "shields companies affiliated through common ownership from tortious interference with contract claims when the companies act in furtherance of their shared legitimate business interests." *Travel Syndication Tech., LLC v. Fuzebox, LLC*, No. 11-cv-0553-RGA-SRF, 2012 WL 1931238, at *5 (D. Del. May 25, 2012) (quoting *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, No. 3637-VCL, 2009 WL 1638634, at *4 (Del. Ch. June 11, 2009)).

Here, Amgen asserts a tortious interference claim against two Harbour entities (HBV and HBM) for allegedly tortiously interfering with the contract of their affiliate, HBAB.  *See* D.I. 332 at 58-59 (¶ 100).  Because HBM owns 100% of HBV and HBAB, no dispute exists that the three parties are affiliates.  *See* D.I. 332 at 41-42 (¶¶ 3-4, 9).

Moreover, as discussed above, Amgen cannot demonstrate that any of the Harbour entities acted in bad faith.  *See infra* Section II.A.  Rather, the Harbour entities have acted in the furtherance of their legitimate business interests, including by asserting patent rights against their competitors Teneobio and Amgen.  **SOF 55-56**.  In doing so, they have taken reasonable litigation positions, including with respect to Amgen's license defense based on the HCAb License Agreement.  *See infra* Section II.A.  Thus, Harbour is protected against Amgen's tortious interference claim by the affiliate privilege, and summary judgment should be granted in Harbour's favor.

### C.     Amgen Cannot Identify Any Evidence To Prove The Intent Element Of Its Claim For Tortious Interference.

In this litigation, Harbour denies Amgen's allegations that HBAB breached its contract with Amgen by joining Amgen in this infringement suit.  D.I. 343 at 9-11 (¶¶ 74-83 (denying the

12

allegations in Amgen's counterclaim for breach of contract)).  Thus, Harbour contends that Amgen will not be able to prove the "actual breach" element of its tortious interference claim.  But, even if HBAB is ultimately found to have breached the HCAb License Agreement, there is *no evidence* that the other Harbour entities knew that HBAB was engaging in conduct that constituted a breach, let alone *intentionally procured* the breach.  On the contrary, as discussed above, the Harbour entities have acted under their bona fide belief that Amgen is willfully infringing the Asserted Patents, *not* licensed to practice the Asserted Patents at all, and certainly not to practice the Asserted Patents using rats.  Indeed, Amgen has not identified any facts to support that HBM or HBV intentionally procured the alleged breach.  *See* **SOF 60; Ex. 17**.  Thus, Amgen cannot show the intent element of its claim for tortious interference.

### D.        Amgen Cannot Prove Damages.

The final element of a tortious interference claim is "damages."  *Lama Holding*, 88 N.Y.2d at 424.  Amgen has no evidence of any damages.  In response to Harbour's discovery requests—including an interrogatory and deposition topic—Amgen provided no discovery about any damages it suffered from Harbour's alleged tortious interference.  **SOF 61-64**.  And Amgen's damages expert offered no opinions on any damages it suffered from Harbour's alleged tortious interference.  **SOF 65-68**.  On this record, Amgen cannot prove damages, and the Court should thus grant summary judgment on Amgen's tortious interference claim.  *See Kaufman v. Alexander*, 62 F.Supp.3d 395, 398 (D. Del. 2014) ("The burden on the moving party may be discharged by demonstrating that there is an absence of evidence supporting the non-moving party's case.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## III.    CONCLUSION

Harbour respectfully requests that the Court enter summary judgment in its favor with respect to Amgen's counterclaim for tortious interference. *See* D.I. 332 at 58 (Count XI).

13

## HARBOUR'S MOTION FOR SUMMARY JUDGMENT
## OF NO FRAUD IN THE INDUCEMENT

Amgen's counterclaim for fraud in the inducement relies entirely on the premise that "***Harbour was aware*** of [a] field of use limitation" in the 2011 License Agreement through which Erasmus granted Harbour a right to practice the Asserted Patents. **SOF 98**. But no evidence supports Amgen's assertion that Harbour was "aware" of that limitation. On the contrary, the undisputed evidence demonstrates that Harbour spent more than a year in a Dutch court advocating its good-faith position that its license ***did not*** contain any such limitation.

On this record, Amgen cannot meet its burden to prove the "knowledge" element of its counterclaim for fraud in the inducement. Moreover, in view of Amgen's assertion of multiple counterclaims for breach of contract, its fraud in the inducement claim is nothing more than a contract claim "masquerading" as a claim of fraud, which is improper under New York law. For those reasons, the Court should grant summary judgment in Harbour's favor.

## I.    LEGAL STANDARD

"The elements of a claim for fraud in the inducement under New York law are: (1) 'a material misrepresentation or omission of fact'; (2) 'made by defendant with knowledge of its falsity'; (3) 'intent to defraud'; (4) 'reasonable reliance on the part of the plaintiff'; and (5) 'resulting damage to the plaintiff.' *Logfret, Inc. v. Gerber Fin., Inc.*, 559 F.Supp.3d 348, 366 (S.D.N.Y. 2021) (quoting *CapLOC, LLC v. McCord*, No. 17-cv-05788 (AT), 2018 WL 3407708, at *9 (S.D.N.Y. June 12, 2018)).

## II.    ARGUMENT

### A.    Amgen Cannot Prove The Knowledge Element Of Its Counterclaim For Fraud In The Inducement.

Amgen bases its counterclaim for fraud in the inducement on ***one*** alleged misrepresentation that Harbour made, namely Harbour's representation in Section 6.1(b) of the HCAb License

14

Agreement that: "███████████████████████████████████████████████." *See* **SOF 80**.  For Amgen to prevail on that counterclaim, Amgen must prove not only that the representation was false, but also that Harbour *knew* it was false in 2013.  *Logfret*, 559 F. Supp. 3d at 366.  Amgen has no evidence to demonstrate that knowledge.

"A party alleged to have committed fraud may rely on good faith as a defense."  *See Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F.Supp.2d 96, 107 (E.D.N.Y. 2012); *see also U.S. v. Jimenez*, 513 F.3d 62, 75 (3d Cir. 2008) ("good faith negate[s] the element of intent to defraud").  Moreover, "fraud will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true."  *Haggar*, 906 F. Supp. 2d at 107 (quotation and citation omitted); *see also Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) ("The allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a deliberate attempt to mislead . . . .") (quotation and citation omitted).[6]

Here, to support the alleged falsity of Harbour's representation, Amgen relies only on a decision from a Dutch court *in 2024*.  In that decision, the Dutch court found that Harbour did not have the right under its 2011 License Agreement with Erasmus to grant sublicenses to practice the Asserted Patents in all rodents.  **SOF 91-92**.  But the Dutch court's decision demonstrates that Harbour litigated in The Netherlands based on its good-faith belief that it *did* have a right under the 2011 License Agreement to grant a sublicense for use in all rodents.  **SOF 84-89**.

For example, the Dutch court noted Harbour's request for "declaratory judgment stating that the 2009 License Agreement grants Harbour[] the exclusive right to commercialize the Patents

---

[6] Although *Haggar* and *Orient Express* addressed claims for fraud on the Patent and Trademark Office ("PTO"), their reasoning should apply equally to a case between private parties.  The same is true of the reasoning in *Jimenez*, which was a criminal case.

for all areas of use." **SOF 85**. The court identified the supporting evidence for that reasonable position, including that Harbour bore the costs associated with Erasmus's patents, **SOF 86**, that Harbour and Erasmus previously agreed that the patents would be transferred to Harbour, **SOF 87**, and that Harbour had an approved business plan that "shows that there was never any intention to limit the rights of Harbour [] under the patents." **SOF 88**. The Dutch court also noted Harbour's fairness-based argument that "it is unimaginable that Dr. Craig and Erasmus[] can grant licenses to third parties for uses other than in transgenic mice and could compete with Harbour [], which could be the consequence of Dr. Craig's interpretation of the license granted to Harbour []." **SOF 89**. Notably absent from the Dutch court's opinion is any suggestion that Harbour's positions were unreasonable or taken in bad faith. **SOF 93**. *See Haggar*, 906 F. Supp. 2d at 107.

The facts here are similar to *Pac-West Distrib. NV LLC v. AFAB Indus. Servs., Inc.*, where the defendant alleged that the plaintiff misrepresented that its products "complied with federal law." 674 F.Supp.3d 132, 145–46 (W.D. Pa. 2023). After noting the defendant's contention that the plaintiff's belief "would be incorrect based on [defendant's] theory of the law," the court held:

> In any event, it is beside the point how a court might resolve this issue on the merits. What matters on this claim is what [the plaintiff] knew or believed, and a fraud claim "will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true." *Warman v. Loc. Yokels Fudge, LLC*, No. 19-cv-1224, 2022 WL 17960722, at *13 (W.D. Pa. Dec. 27, 2022). [The defendant] has presented no evidence, let alone clear and convincing evidence, to suggest that [the plaintiff] did not believe that his statement was true when he made it.

*Pac-West*, 674 F. Supp. 3d at 146. Here, like in *Pac-West*, it is "beside the point" how the Dutch court resolved the scope of the Harbour-Erasmus license on the merits; what matters is what Harbour "knew or believed" in 2013 when it entered the HCAb License Agreement. *Id.*

More generally, it is axiomatic that a good-faith belief in the truth of a representation negates any knowledge of its falsity, and courts have held accordingly in a variety of contexts. For

16

example, a court in this District held that "[a]n oath is not false merely if a statement contained therein ultimately proves to be inaccurate" because "[t]o the contrary, the issue is not the ultimate truth of averments in an oath, but rather whether or not the averments were believed to be true." *Stamicarbon, N.V. v. Chem. Constr. Corp.*, 401 F.Supp. 384, 395 (D. Del. 1975), *rev'd on other grounds* 544 F.2d 645 (3d Cir. 1976).  In a different context, the Federal Circuit has held that a "good faith belief in non-infringement negates the knowledge requirement" for indirect infringement.  *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 523 (Fed. Cir. 2016). Here, the undisputed evidence—including Harbour's conduct in litigating reasonable positions in the Dutch court—demonstrates that Harbour held an honest good-faith belief in the truth of its representations and warranties to Amgen about the scope of its license from Erasmus.

Ultimately, the relevant question is ***not*** (as Amgen suggests) whether the scope of Harbour's license from Erasmus is ***currently*** understood to be limited to transgenic mice, but rather whether Harbour knew about that limitation ***at the time*** it made representations and warranties to Amgen.  The Dutch court's decision—the only evidence on which Amgen relies—does nothing to answer that question.  Accordingly, Amgen cannot prove the knowledge element of its fraud in the inducement counterclaim, and the Court should grant summary judgment in Harbour's favor.

**B.      Amgen's Fraud In The Inducement Claim Is Improperly Duplicative Of Its Claims For Breach Of Contract.**

Although "New York law allows a plaintiff to assert a claim for both breach of contract and fraud arising out of the same transaction . . . New York Law does not recognize claims that are essentially contract claims masquerading as claims of fraud."  *W.B. David & Co. v. DWA Commc'ns, Inc.*, No. 02-cv-08479 (BSJ), 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004) (citations omitted).  Accordingly, "[a] party alleging a fraudulent inducement claim under New York law must also '(i) demonstrate a legal duty separate from the duty to perform under the

17

contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'" *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F.Supp.3d 322, 352 (S.D.N.Y. 2020) (quoting *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996)).

Here, Amgen asserts counterclaims for breach of warranty and fraud in the inducement, which both arise out of the same HCAb License Agreement. D.I. 332 at 56-58, 60-63. But Amgen cannot meet any of the *Bridgestone/Firestone* conditions to allow assertion of both claims.

*First*, Amgen cannot demonstrate any legal duty Harbour owed Amgen separate from the HCAb License Agreement. *See Bridgestone/Firestone*, 98 F.3d at 20. For example, Harbour owed Amgen no fiduciary duty nor any special duty of care from any pre-existing relationship. Harbour and Amgen were two separate parties that engaged in an arms-length negotiation. **SOF 76-77**.

*Second*, Amgen cannot demonstrate any fraudulent misrepresentation that was collateral or extraneous to the HCAb License Agreement. *See Bridgestone/Firestone*, 98 F.3d at 20. On the contrary, the *only* alleged misrepresentation on which Amgen relies is the statement in Section 6.1(b) of the HCAb License Agreement itself. **SOF 94-99**.

*Third*, Amgen has not identified any special damages allegedly caused by Harbour's misrepresentation that would be unrecoverable as contract damages. *See Bridgestone/Firestone*, 98 F.3d at 20. Amgen stated in an interrogatory response that "Amgen would have paid less under the HCAb License Agreement, or may never have entered it at all." **SOF 99**. But that response suggests a remedy that would return Amgen to the position it was in before the HCAb License Agreement was executed—also known as "reliance damages," a well-established category of *contract* damages. *See McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, No. 89-cv-01489 (PNL), 1990 WL 138959, at *8 (S.D.N.Y. Sep. 14, 1990) ("The purpose of . . . reliance damages is. . . to

return the innocent party to the economic position it occupied before the contract was entered into."); *see also World of Boxing, LLC v. King*, 634 F. App'x 1, 3 (2d Cir. 2015) ("Under New York law, a plaintiff may recover damages based on his reliance interest, including expenditures made in preparation for performance or in performance . . . .") (internal quotation marks and citations omitted). Thus, Amgen has not identified any special damages from the alleged fraud that would be unrecoverable under its breach of warranty claim.

Therefore, because Amgen is asserting "essentially [a] contract claim[] masquerading as [a] claim[] of fraud," its counterclaim for fraud in the inducement fails as a matter of law.

## III. CONCLUSION

For the above reasons, Harbour respectfully requests that the Court enter summary judgment in its favor with respect to Amgen's counterclaim for fraud in the inducement.

## HARBOUR'S MOTION FOR SUMMARY JUDGMENT OF NO UNENFORCEABILITY

Defendants' inequitable conduct theory is based exclusively on allegations that pertain to the inventorship of the '420 patent. But inventorship is an issue that can be corrected. Indeed, at this point, the inventorship of the '420 patent has already been corrected in this case without opposition from Defendants. Accordingly, Defendants cannot meet the "but-for" materiality standard required to prove inequitable conduct. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). Thus, summary judgment should be granted in Harbour's favor on Defendants' counterclaim and affirmative defense regarding unenforceability of the '420 patent. *See* D.I. 332 ¶¶ 123-153 (Count XIII); *Id.* at 40 (Fourteenth Affirmative Defense).

## I. LEGAL STANDARD

Defendants bear the burden of proving inequitable conduct by clear and convincing evidence. *Therasense*, 649 F.3d at 1287. To meet that burden, defendants must prove: (1) that the

patentee misrepresented or withheld information that was "but-for" material to patentability; and (2) that the patentee acted with specific intent to deceive the Patent Office. *Id.*

In the context of inequitable conduct, the Federal Circuit has imposed the heightened standard of "but-for" materiality, which is intended to combat the "overuse of the inequitable conduct doctrine" by defendants in patent suits. *Id.* at 1285; *see also id.* at 1289 ("[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds . . . .") (citation omitted). In assessing "but-for" materiality, "the court must determine whether the PTO would have allowed the claim if it had been aware of the" withheld information. *Id.* at 1291. Thus, the Federal Circuit has made clear, "enforcement of an otherwise valid patent does not injure the public merely because of misconduct, lurking somewhere in patent prosecution, that was immaterial to the patent's issuance." *Id.* at 1292.

## II.    ARGUMENT

### A.    As A Matter Of Law, Defendants Cannot Meet The "But-For" Materiality Requirement Based On Omitted Inventorship Information.

Defendants allege inequitable conduct based ***only*** on allegations about inventorship. Specifically, Defendants allege that Dr. Frank Grosveld (inventor) and Ms. Doreen Trujillo (prosecuting attorney) withheld information from the Patent Office about the allegations of a former employee, Dr. Roger Craig, that he was an inventor of the '420 patent. **SOF 103-107**. According to Defendants, the '420 patent would not have issued if the PTO had been informed about Dr. Craig's allegations. **SOF 105**. But that theory as applied to this case fails under the law.

***First***, the Federal Circuit recently confirmed that "a patent ***cannot*** be invalidated if inventorship can be corrected instead." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020). Thus, where inventorship can be corrected, "incorrect inventorship evidence is

20

not but-for material under *Therasense*." *Auxilium Pharms., Inc. v. Watson Lab'ys, Inc.*, No. 12-3084 (JLL), 2014 WL 9859224, at *35 (D.N.J. Dec. 16, 2014). That is the situation here. Even if the Patent Office had known about, and credited, Dr. Craig's allegations about inventorship, it still would have allowed the claims. Said differently, any inventorship dispute for the '420 patent categorically could not have been but-for material to patentability where it could be corrected.

*Second*, this Court already resolved any question about whether Dr. Craig's allegations impacted the patentability of the '420 patent. **SOF 119-120**. In response to a motion filed by Dr. Craig, the Court added Dr. Craig as an inventor to the '420 patent, and the patent remains valid. *Id*. Therefore, with respect to Dr. Craig's allegations of inventorship, "there is no evidence that the [PTO] would not have issued the claims if it had been aware of the additional inventorship information." *Dexcowin Glob., Inc. v. Aribex, Inc.*, 2017 WL 3477748, at *10 n.3 (C.D. Cal. June 7, 2017). On the contrary, the evidence shows that Dr. Craig's inventorship allegations "would not have changed the issuance decision" for the '420 patent. *Therasense*, 649 F.3d at 1293.

*Finally*, it is notable that Defendants did not oppose Dr. Craig's motion to correct inventorship. **SOF 115**. By declining to oppose, Defendants effectively conceded that adding Dr. Craig as an inventor was permissible, and that the '420 patent should not be invalidated over the inventorship issue. In other words, Defendants conceded that any information about Dr. Craig's inventorship allegations was *not* but-for material to patentability.

Under these circumstances, Defendants cannot meet their burden of proof on inequitable conduct, and summary judgment should be granted in Harbour's favor.

## B.    Defendants Have Not Pled Any Inequitable Conduct Theory Other Than "But-For" Materiality.

The law recognizes a limited exception to the "but-for" materiality requirement under "extraordinary circumstances" when "affirmative acts of egregious misconduct" may be material

per se. *Therasense*, 649 F.3d at 1292–93. But Defendants cannot meet that extraordinary standard for two reasons. First, Defendants did not plead egregious misconduct. **SOF 109**. And second, mere "failure to disclose information that would not have changed the issuance decision" does not constitute affirmative egregious misconduct. *Id.* at 1293; *see also id.* at 1292–93 ("claims of inequitable conduct that are based on such omissions require proof of but-for materiality.").

*First*, as noted, Defendants' inequitable conduct theory is premised on Dr. Grosveld's and Ms. Trujillo's alleged failure "to disclose that Dr. Craig was an inventor of one or more claims of" the '420 Patent to the Patent Office. **SOF 104**. Defendants allege that "[b]y *withholding this information*, [Dr. Grosveld and Ms. Trujillo] deprived the Patent Office Examiner of information material to the validity of one or more claims of the '420 Patent." **SOF 106**. As such, Defendants pled an inequitable conduct theory that requires "but-for" materiality; that is "[t]he Patent Office would not have allowed one or more claims of the '420 Patent had it been aware that Dr. Craig was an inventor of those claims but he was not properly attributed as an inventor." **SOF 105**.

Defendants did *not* plead a theory based on egregious misconduct. **SOF 109**. The words "egregious" and "misconduct" do not appear in Defendants' counterclaim. *Id*. Nor does the counterclaim identify any alleged affidavit or declaration submitted to the Patent Office by anyone at Harbour, let alone that such an affidavit was "unmistakably false" as required under *Therasense*. **SOF 110**. The law requires claims of fraud—like inequitable conduct—be pled with particularity. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326–27 (Fed. Cir. 2009). Here, Defendants have not come close to that standard for any theory based on egregious misconduct.

Having failed to plead a theory based on egregious misconduct, Defendants cannot shift course now and assert one at the summary judgment stage. Indeed, courts have refused to allow unpled inequitable conduct theories to survive summary judgment, recognizing the prejudice

22

associated with forcing patent owners to defend against unspecified allegations of fraud. *See Cal. Inst. of Tech. v. Broadcom Ltd.* ("Broadcom I"), No. 16-cv-03714-GW (AGRx), 2019 WL 8807748, *3 (C.D. Cal. July 1, 2019) (declining "to permit Defendants to rely on an unpled inequitable conduct claim on the basis that it was disclosed in written discovery"); *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 992 (Fed. Cir. 2022) (affirming *Broadcom I*); *Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*, No. 06-cv-00601-JJF, 2009 WL 2524577, at *3 (D. Del. Aug. 17, 2009) (striking defendant's motion for summary judgment of IC where the theory had not been pled); *Skillz Platform Inc. v. Aviagames Inc.*, No. 21-cv-02436-BLF, 2023 WL 6542147, at *5 (N.D. Cal. Oct. 6, 2023) (deeming unpled IC theories waived at summary judgment); *CSB-Sys. Int'l Inc. v. SAP Am., Inc.*, No. 10-cv-02156, 2012 WL 1645582, at *6 (E.D. Pa. May 10, 2012) ("Repeatedly, courts have declined to allow a defendant to assert a new theory of inequitable conduct if the answer and counterclaims asserted a different theory of inequitable conduct than that relied upon in summary judgment proceedings.") (collecting cases). Here, this Court should not force Harbour to defend against shifting accusations that it somehow committed an affirmative act of egregious misconduct without notice.

*Second*, even if Defendants had pled an egregious misconduct theory, the undisputed facts do not support such a theory. Defendants' allegations are based entirely on alleged *omissions* by Dr. Grosveld and Ms. Trujillo, specifically omissions of information about allegations made by Dr. Craig regarding inventorship. **SOF 104-108**. But omissions cannot, as a matter of law, be affirmative acts of egregious misconduct. *Therasense*, 649 F.3d at 1292–93.

## III.   CONCLUSION

For the foregoing reasons, Harbour respectfully requests summary judgment in its favor on Defendants' counterclaim and affirmative defense regarding unenforceability of the '420 patent (Count XIII and Fourteenth Affirmative Defense).

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Desmarais
Tamir Packin
Kyle G. Petrie
Jordan N. Malz
Michael E. Furrow
Karl Mullen
Jun Tong
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

Adam D. Steinmetz
Rebecca Lindhorst
Thomas Romanchek
DESMARAIS LLP
1899 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20006
(202) 451-4900

Maria Tartakovsky
DESMARAIS LLP
101 California Street
Suite 3000
San Francisco, CA 94111
Tel: (415) 573-1900

Dated: December 23, 2025
12622192 / 24513.00001

**Public Version Dated: January 8, 2026**

By: /s/ David E. Moore
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew M. Moshos (#6685)
    Malisa C. Dang (#7187)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    amoshos@potteranderson.com
    mdang@potteranderson.com

*Attorneys for Plaintiffs/Counterclaim Defendants Harbour Antibodies BV, Harbour Antibodies HCAb BV, HBM Holdings Ltd.'s and Erasmus University Medical Center Rotterdam*

24